RECEIVED

JUL 14 2025

Wendy R Oliver, Clerk
U.S. District Court
W.D. OF TN, Memphis

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cr. No.: 25-I-14** |
| | ) | |
| **vs.** | ) | **18 U.S.C. § 371** |
| | ) | |
| **CORNELIUS LETRELL MARTIN,** | ) | 2:25-cr-20174-JTF-001 |
| | ) | |
| **Defendant.** | ) | |

## INFORMATION

**THE UNITED STATES ATTORNEY CHARGES:**

At all times material to this Information:

**Health Care Benefit Programs and Claims Submission Process**

1. The Federal Employees' Compensation Act ("FECA") provided for payment of workers' compensation benefits to federal employees who suffered injury, disease, or death in the performance of duty. Benefits under FECA were paid out of the federal Employees' Compensation Fund, which was financed by appropriations from Congress.

2. FECA was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3. Injured federal workers insured under FECA were generally referred to as "claimants."

4. FECA covered, among other things, necessary medical care and pharmaceuticals necessary to treat symptoms that were the result of a work-related injury when prescribed by a practitioner and medically necessary to cure, give relief, reduce the degree or period of disability, or aid in lessening the amount of monthly compensation.

5. FECA was administered by the United States Department of Labor ("DOL"), Office of Workers' Compensation Program ("OWCP"). Providers of health care services were required to enroll with DOL-OWCP to receive a provider identification number and reimbursement under FECA. Form OWCP-1168 was utilized for enrollment and updating provider information. By completing and submitting Form OWCP-1168, a provider certified that all Federal and State licensure and regulatory requirements applicable to its provider type were satisfied.

6. To qualify for reimbursement under DOL-OWCP, all items provided or services rendered needed to be: (a) medically necessary and actually provided or rendered; (b) prescribed or recommended by a qualified practitioner; and (c) supported by medical documentation.

7. DOL-OWCP contracted with Affiliated Computer Services, Inc. ("ACS") to provide medical claims processing and payments. ACS served as the billing administrator for FECA and, in that capacity, received provider enrollment forms from prospective FECA providers, assigned provider numbers, and processed and paid claims for benefits under FECA.

8. All providers who enrolled with DOL-OWCP did so through ACS. Once enrolled, a provider was given access to the ACS online system, through which a provider could submit claims, check the status of pending claims, and perform other billing-related functions. Providers were required to identify themselves on each claim for services provided, as well as the items or services provided on each claim. The submission of a claim and acceptance of payment by a provider signified that the item or service for which reimbursement was sought was performed as described, and was necessary,

appropriate, and properly billed in accordance with accepted industry standards. It was not within industry standards, among other things, to charge for items or services that were not provided, were not medically necessary, and were not legitimately prescribed. FECA paid claims for prescriptions on behalf of beneficiaries to the pharmacy's financial institution by wire, check, and electronic transfer.

9. Starting in February 2021, DOL-OWCP entered into a contract with Optum Workers' Compensation Services of Florida ("Optum") to serve as its Pharmacy Benefit Manager ("PBM"). On or about March 9, 2021, FECA mandated that all claimants receive their prescription drug benefits from a pharmacy enrolled in Optum's network. As the PBM, Optum's responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. Optum also audited participating pharmacies to ensure compliance with its rules and regulations.

10. Pharmacies participating in DOL-OWCP's pharmacy program were required to enter into provider agreements with Optum. By contracting with Optum, pharmacies agreed to comply with all applicable laws, rules, and regulations.

11. Electronic claims submitted to DOL-OWCP and FECA, through ACS or Optum by providers located in Tennessee and Arkansas necessarily traveled by interstate wire to be adjudicated. For example, regardless of the location of the pharmacies that provided pharmacy benefits, ACS adjudicated claims submitted electronically in Pittsburgh, Pennsylvania, and Optum adjudicated claims submitted electronically in Westerville, Ohio.

12. The Division of Federal Employees' Compensation ("DFEC") published a list of National Drug Codes ("NDCs") that would be denied coverage. If the drug was not

on the deny list, FECA would generally pay for the drug in full, with claimants not being required to pay copayments associated with their prescription benefits.

13. When seeking reimbursement from DOL-OWCP, service providers submitted the cost of the item or service together with the appropriate "procedure code," as defined by the American Medical Association, and as set forth and maintained in the Current Procedural Terminology ("CPT") Manual, or by the Healthcare Common Procedure Coding System ("HCPCS").

14. HCPCS codes beginning with the letter "J" were used to report non-self-administered medication and chemotherapy drugs and were often referred to as "J codes." J codes were utilized by non-pharmacy medical providers to bill DOL-OWCP for drugs dispensed in an office setting, including compounded medications. Most J codes were assigned to a specific drug and quantity of drug. J-3409 was used for non-coded, unclassified drugs when another J code did not describe the drug being administered.

15. In 2018, in recognition of the potential for fraud, waste, and abuse in the dispensation of compounded medications, DOL-OWCP began placing restrictions on the coverage of J codes to only cover those medications that needed to be administered by a physician, and not medications that ordinarily could be self-administered and obtained in a pharmacy setting, including compounded medications. Specifically, on May 18, 2018, DOL-OWCP issued FECA Circular No. 18-06, which required unspecified J codes to be submitted with an NDC and the day's supply, and also required that the submission be subject to prior authorization by claims staff.

**<u>The Defendant and Relevant Entities and Individuals</u>**

16. Defendant **CORNELIUS LETRELL MARTIN** ("**MARTIN**"), of Shelby

County, Tennessee, conducted marketing operations for, and held a recorded 30% ownership interest in, MedPartners, Inc. ("MedPartners") and SarJo Pharmacy, Inc. ("SarJo"), located in the Western District of Tennessee and elsewhere, which purported to treat injured postal workers.

17. MedPartners, formed on or about July 15, 2016, was a medical clinic with locations in Memphis, Tennessee, Nashville, Tennessee, and Little Rock, Arkansas.

18. SarJo, formed on or about April 10, 2018, was a pharmacy located in Memphis, Tennessee.

19. Co-conspirator 1, of Shelby County, Tennessee, controlled and managed MedPartners and SarJo.

20. Co-conspirator 2, of Shelby County, Tennessee, held a recorded 70% ownership interest in and managed MedPartners and SarJo.

21. Pharmacist 1, of Shelby County, Tennessee, was a pharmacist licensed in the State of Tennessee and the pharmacist-in-charge ("PIC") of SarJo.

22. Provider 1, of Shelby County, Tennessee, was a nurse practitioner licensed to practice in the State of Tennessee who worked at MedPartners' Memphis location.

23. Provider 2, of Fayette County, Tennessee, was a physician licensed to practice in the State of Tennessee.

24. Provider 3, of Jefferson County, Arkansas, was a physician licensed to practice in the State of Arkansas.

**COUNT 1**
**Conspiracy to Defraud the United States**
**(18 U.S.C. § 371)**

25. Paragraphs 1 through 24 of this Information are re-alleged and incorporated

by reference as though fully set forth herein.

26. Beginning in or around August 2021, and continuing through in or around December 2021, in Shelby County, in the Western District of Tennessee, and elsewhere, the defendant,

**CORNELIUS LETRELL MARTIN,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate and agree with Co-conspirator 1, Co-conspirator 2, and other persons known and unknown to the United States Attorney, to defraud the United States by cheating the United States government and any of its departments and agencies out of money and property, and by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of FECA.

**Purpose of the Conspiracy**

27. The purpose of the scheme was for **MARTIN**, Co-conspirator 1, Co-conspirator 2, and others to unlawfully enrich themselves and others by: (a) dispensing medically unnecessary medications to claimants through SarJo when those medications had not been prescribed by a qualified practitioner; (b) submitting and causing the submission of false and fraudulent claims through SarJo to FECA for the dispensing of these medically unnecessary medications, and for the purported dispensing of medications that had not, in fact, been dispensed to claimants and were not carried in stock at SarJo; (c) receiving and obtaining the reimbursements paid by FECA based on the false and fraudulent claims submitted; and (d) diverting proceeds of the fraud for the personal use and benefit of **MARTIN**, Co-conspirator 1, Co-conspirator 2, and others, and

to further the fraud.

**Manner and Means of the Conspiracy**

28. The manner and means by which **MARTIN**, Co-conspirator 1, Co-conspirator 2, and others sought to accomplish the object and purpose of the scheme included, among others, the following:

a. In or around July 2016, **MARTIN** began having conversations with Co-conspirator 1 about billing for compounded medications in connection with the medical treatment of injured federal workers, with **MARTIN** sending a text message to Co-conspirator 1, stating: "I'm ready to get this business going like ASAP . . . What's the name of the USPO insurance provider?."

b. In or around September 2016, **MARTIN** and Co-conspirator 1 began visiting DOL-OWCP providers to persuade them to prescribe compounded medications to claimants. On or about September 22, 2016, **MARTIN** and Co-conspirator 1 approached a provider at a medical center located in Shelby County, Tennessee, stating that they had struck a deal with the United States Post Office unions to find medical clinics to treat injured workers and were seeking providers to prescribe a specific compounded pain cream to these injured workers. **MARTIN** and Co-conspirator 1 were not successful in their efforts to recruit a DOL-OWCP provider to prescribe compounded medications to claimants.

c. In furtherance of the scheme, on October 4, 2016, **MARTIN** emailed Co-conspirator 1 a list of NDCs of various drugs along with their corresponding AWPs.

d. On or about February 10, 2017, Provider 1 began working for MedPartners. During Provider 1's employment with MedPartners, Provider 1 never wrote

a prescription for any MedPartners patients, but merely determined whether patients were eligible for medications.

e. In or around February 2017, Provider 2 entered into an agreement with MedPartners to work as a collaborating physician for Provider 1. Although Provider 2 had a signature stamp for Provider 1 to utilize as authorized on documents, Provider 2 did not authorize Provider 1 or anyone else to utilize Provider 2's signature stamp on prescriptions and had no knowledge of Provider 2's signature stamp being used on prescriptions. Provider 2 did not write any prescriptions for MedPartners patients.

f. **MARTIN** also exchanged text messages with Co-conspirator 2 regarding the scheme to defraud. For example, on or about April 28, 2017, Co-conspirator 2 texted **MARTIN**, "Hi. Have you developed a title for yourself yet? Director of Marketing or Director of Operations :-D". **MARTIN** responded, "Lol... ummmmm... 'Director of Operations'".

g. Starting on May 25, 2017, MedPartners began submitting claims for compounded medications utilizing CPT Code J3490—"Unclassified Drugs – Drugs administered other than oral method, chemotherapy drugs."

h. On or about August 1, 2017, a meeting of the Board of Directors of MedPartners was held to vote on the issuance of 30% of the authorized common shares to **MARTIN**. Co-conspirator 2 was listed as owning the remaining 70% of the shares, and Co-conspirator 2 signed the certification of the share issuance as President of MedPartners.

i. Following the May 2018 issuance of FECA Circular No. 10-06 restricting the use of unspecified J codes, SarJo was formed.

j. On June 1, 2018, a meeting of the Board of Directors of SarJo was held to vote on the issuance of 30% of the authorized common shares to **MARTIN**. Co-conspirator 2 was listed as owning the remaining 70% of the shares, and Co-conspirator 2 signed the certification of the share issuance as President of SarJo.

k. On or about September 23, 2020, the Tennessee Board of Pharmacy conducted an investigation of SarJo based on a complaint of noncompliant compounding practices. When the investigator arrived, Pharmacist 1 was not present at SarJo as required. Instead, **MARTIN** and Co-conspirator 1 were present in the pharmacy. Although **MARTIN** questioned Co-conspirator 1 regarding the investigation, Co-conspirator 1 failed to provide significant detail regarding the investigation.

l. Co-conspirator 1 ordered the medications for SarJo and submitted claims to health care benefit programs, including DOL-OWCP, for prescription medications purportedly dispensed by SarJo.

m. Although **MARTIN** was not privy to the ordering of or billing for medications, **MARTIN** knew that SarJo only dispensed lidocaine patches and diclofenac gel and knew roughly how profitable those products were. **MARTIN** began to suspect that Co-conspirator 1 and Co-conspirator 2 were committing fraud when the dividend checks that **MARTIN** received grew out of proportion to the amounts that the medications that SarJo dispensed could possibly reimburse.

n. These suspicions were heightened when Co-conspirator 1 described to **MARTIN** that if insurance companies stopped reimbursing on one version of diclofenac, Co-conspirator 1 would substitute another version of diclofenac, or another medication, and would submit bills to determine what products were still being reimbursed.

o. **MARTIN** confronted Co-conspirator 1 with his concerns at various times, but Co-conspirator 1 always attempted to assuage **MARTIN**'s concerns and also suggested that **MARTIN** shared any responsibility due to his receiving shares of the MedPartners and SarJo profits.

p. On August 26, 2021, investigators lawfully executed three search warrants on the MedPartners locations in Memphis and Arkansas and on SarJo. Following the execution of the search warrants, **MARTIN**'s suspicions regarding fraud were confirmed. Nevertheless, **MARTIN** continued in his role with MedPartners and SarJo, and continued receiving ownership dividends, until his resignation on January 4, 2022.

q. Following the execution of the search warrants, and continuing through December 2021, SarJo submitted 227 additional prescription drug claims. SarJo billed Optum approximately $1,394,493.62 for those claims, and FECA paid SarJo approximately $1,050,056.64.

r. At least 226 of those additional prescription claims were submitted for drugs that SarJo did not carry in stock at the pharmacy and did not dispense to claimants.

s. From December 2017 until his resignation in January 2022, **MARTIN** received at least $3,311,716.41 in dividend payments from MedPartners and SarJo.

**Overt Acts**

29. In furtherance of the conspiracy, and to accomplish its objects and purpose, **MARTIN** and his co-conspirators committed and caused to be committed, in Shelby County, in the Western District of Tennessee, and elsewhere, the following overt acts:

a. On or about October 29, 2021, **MARTIN** and his co-conspirators caused SarJo to submit an electronic claim for NDC No. 7192998303, Diclofenac Sodium 100% Miscell Powder, to DOL-OWCP for patient L.B. The billed amount of the claim was approximately $7,512.45, and SarJo was paid approximately $5,656.00 on or about November 4, 2021.

b. On or about December 6, 2021, **MARTIN** and his co-conspirators caused SarJo to submit an electronic claim for NDC No. 38779320905, Baclofen Powder, to DOL-OWCP for patient L.I. The billed amount of the claim was approximately $5,114.69, and SarJo was paid approximately $3,852.04 on or about December 16, 2021.

All in violation of Title 18, United States Code, Section 371.

JOSEPH MURPHY Digitally signed by JOSEPH MURPHY
Date: 2025.07.11 08:27:20 -05'00'

**JOSEPH C. MURPHY, JR.**
**INTERIM UNITED STATES ATTORNEY**

**LORINDA LARYEA**
**ACTING CHIEF, FRAUD SECTION**
**U.S. DEPARTMENT OF JUSTICE**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cr. No.: 25-I-________** |
| | ) | |
| **vs.** | ) | **18 U.S.C. § 371** |
| | ) | |
| **CORNELIUS LETRELL MARTIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**NOTICE OF PENALTIES**

**COUNT 1**

[nmt 5 yrs. imprisonment; nmt $250,000 fine, or both, nmt a 3 yr. period of supervised release and a special assessment of $100, see 18 U.S.C. § 3013 (a)].